## A08A0119. CLARENDON NATIONAL INSURANCE COMPANY et al. v. JOHNSON.
(666 SE2d 567)

SMITH, Presiding Judge.

Clarendon National Insurance Company ("Clarendon"), American Trans-Freight, LLC, ATF Trucking, LLC, and ATF Logistics, LLC appeal from a jury verdict in favor of Brent Johnson in this personal injury case arising out of an accident involving a commercial box truck.[1] Appellants assert that the trial court erred: (1) by denying their motions for directed verdict and judgment notwith-

---

[1] A "commercial motor vehicle" is "any self-propelled ... motor vehicle used on a highway in interstate commerce to transport ... property ... when the vehicle" weighs more

standing the verdict on the issues of vicarious liability and stubborn litigiousness; (2) by admitting into evidence a contract and a bill of lading; and (3) in its charge to the jury. For the reasons set forth below, we reverse.

The standard of review

> for granting motions for directed verdict and for j.n.o.v. is the same. They may be granted only when no conflict exists in the evidence and the evidence presented, with all reasonable inferences therefrom, demands a particular verdict. On appellate review of the denial of either motion, we construe the evidence in the light most favorable to the verdict and resolve any doubts or ambiguities in favor of the verdict.

*American Assn. of Cab Companies v. Parham*, 291 Ga. App. 33, 34 (1) (661 SE2d 161) (2008).

The record shows that on August 28, 2003, Robert Wesley Carnley crossed into the opposite lane of travel and collided with a pickup truck driven by Johnson when Carnley was unable to stop behind a car that had stopped in an intersection. Carnley told a police officer after the accident that "he was running too fast to stop." Carnley admitted liability at trial and testified that the accident happened when he "rounded a curve and the sunlight was in my eyes and cars stopped in the road and I just misjudged." Carnley is legally blind in his right eye and did not possess a commercial driver's license at the time of the accident. Johnson's injuries from the accident included "fairly severe fracture dislocations" of his left leg that required multiple surgeries to repair and resulted in permanent partial disability.

At the time of the accident, Carnley was hauling a shipment of carpet bound for California under an interstate bill of lading. C&C Motor Freight hired Carnley to pick up the carpet in Calhoun, Georgia and take it to C&C's warehouse in Chatsworth, Georgia, where the carpet shipment would be consolidated with other shipments. Wesley Carnley's father (Robert Carnley) and stepmother (Colleen Carnley) owned and operated C&C Motor Freight. Robert and Colleen Carnley denied that Wesley Carnley was an employee of C&C, claiming instead that he was an independent contractor. Wesley Carnley owned the truck he was driving at the time of the accident.

C&C acted as an independent sales agent under a written contract with American Trans-Freight, LLC, ATF Trucking, LLC,

---

than 10,000 pounds. 49 CFR § 390.5. There is no dispute that the truck at issue in this case weighed 26,000 pounds.

and ATF Logistics, LLC. The agreement specified that the three entities with whom C&C contracted would collectively be referred to in the agreement as "ATF." The agreement contained the following relevant provisions:[2]

> WHEREAS, ATF is a motor carrier[3] in interstate commerce with certified authority to transport general commodities and desires to appoint agent to act as its independent sales agent in the solicitation of such transportation service business and to arrange for the movement by ATF of such freight, and agent desires to act as such agent.
>
> NOW THEREFORE, it is mutually agreed between the parties as follows:
>
> 1. *Designation of Agent*. ATF does hereby designate and appoint agent and agent does hereby consent and agree to act as an independent sales agent for ATF in soliciting from the public, general commodities freight originating at various points throughout the United States, the same to be transported by ATF in its business as an authorized motor carrier of freight in interstate commerce or pursuant to ATF's brokerage authority. . . . If the agent brokers a load to another carrier, it is agent's responsibility to make sure that the carrier has adequate insurance (without sub-limits) to cover the full cargo value of the load. If there is a loss on a load and carrier does not have adequate insurance to reimburse ATF or shipper for the loss, the agent will be held responsible for the deficiency.
>
> 2. *Duties of Agent*. Agent will diligently and faithfully serve ATF as an independent sales agent for the term of this agreement utilizing agent's best efforts and abilities to the extent reasonably required. Agent agrees that all freight agent solicits will be exclusively on behalf of ATF and shall be first presented to ATF for acceptance, and if so accepted agent will make all necessary and customary arrangements for the movement of such freight. Agent promises and

---

[2] The agreement contained no provisions relating to liability insurance.

[3] Evidence submitted at trial showed that, at the time of the accident, only ATF Trucking, LLC was an authorized motor carrier. ATF Logistics, LLC "was a licensed property broker" and "American Trans-Freight, LLC [wa]s a brand with neither operating authority of trucks or brokerage." As a broker, ATF Logistics "arrange[d] for the transportation of property for others and guarantee[d]" payment for the interstate trucking companies used to transport shipments.

agrees to comply with all rules and regulations promulgated by ATF, from time to time, relating to the performance as an agent of ATF, including rates and terms for transportation services to be provided by ATF.

3. *Independent Contractor Relationship.* With respect to all matters relating to this agreement, agent shall be deemed to be an independent contractor and shall bear its own expenses in connection with this agreement. Agent has sole responsibility of the day-to-day operation of its business operations and full control and direction of agent's employees. Agent shall not represent itself or its organization as having any relationship to ATF other than that of an independent agent for the limited purposes described in this agreement.

. . .

7. *Settlement of Commissions.* Agent shall be paid weekly based upon a settlement sheet listing all loads for which adequate paperwork to complete the billing has been received by ATF's corporate offices. . . . All billing of customers will be done through ATF's corporate offices in Morrisville, Pennsylvania in accordance with ATF's then current billing practices.

8. Agent agrees to protect, indemnify and hold ATF harmless from any claims arising as a result of agent's performance of its duties and against all losses, direct or consequential damages, costs, expenses, including reasonable attorneys' fees, that may be suffered or incurred by ATF as a result of agent's negligence in performing or failing to perform any of the services or obligations on the part of the agent to be performed pursuant to the terms of this agreement.

An ATF representative explained that agents for ATF "offer trucking services to customers in their area that they control and trucks they controlled." This representative acknowledged that agents would use ATF's motor carrier authority if they did not have their own.

Robert Carnley testified that C&C initially operated as a registered motor carrier with its own DOT number until it "changed over to American Trans-Freight." Al Pinion, "a business development salesman" of ATF, contacted Robert Carnley about leasing his trucks to ATF. Pinion's job included "hunting companies to lease

on." Company trucks owned by C&C were leased to ATF. Evidence introduced at trial showed that throughout C&C's relationship with ATF, trucks owned by C&C hauled and operated solely "under ATF's authority as an interstate carrier." Evidence also showed, however, that C&C paid two drivers cash to pick up shipments, drivers who were not driving C&C owned or leased trucks.

Colleen Carnley testified that when she placed a shipment with a carrier leaving C&C's warehouse, she was required to check "on our computer database that we have with ATF to see if they're an approved carrier through ATF. . . . ATF has to have the proper paperwork on them for us to use them to haul a load." Other motor carriers "had to be approved through ATF. We had to send their paperwork and get their approval and they would get a code." According to Colleen Carnley, they could *not* "deal" with other motor carriers of their choosing while they "were under contract with ATF." An ATF representative denied that it exercised any control over what motor carriers C&C could use to haul shipments.

ATF representatives were aware that C&C picked up freight to be consolidated in C&C's warehouse. ATF's director of safety and compliance knew that independent agents of ATF who did not have their own motor carrier authority operated under ATF's motor carrier authority. ATF representatives also knew that C&C did not have its own motor carrier authority "from the time they signed on with ATF."

Colleen Carnley testified that ATF Logistics handled the billing for C&C's operations. All bills were submitted to ATF Logistics, who in turn billed the various parties involved. When the parties paid ATF Logistics, ATF Logistics then paid C&C. She testified that she paid Wesley Carnley in cash or through a C&C company check and denied billing his charges to anyone else.

All of the Carnleys denied that Wesley Carnley had leased himself or his truck to any ATF defendant at the time of the accident. There is no evidence in the record that ATF had actual knowledge that C&C hired Carnley to pick up loads in Georgia that were designated for delivery out-of-state. Carnley paid for all needed fuel and repairs for his truck. The truck did not have a company name, logo, sign, or DOT numbers displayed on it. Colleen Carnley testified that she had no contact with ATF when she asked Wesley Carnley to pick up the load involved in the accident.

The only bill of lading for the load carried by Carnley at the time of the accident listed the carrier as "C&C/ATF." This document was prepared by the entity requesting shipment of the goods, not C&C or ATF.

Following the accident, Johnson sued Robert Wesley Carnley, Robert Darrell Carnley, Colleen Carnley, C&C Motor Freight, Inc.,

the three ATF defendants, and ATF's insurer, Clarendon. The ATF defendants asserted a cross-claim against the Carnleys and C&C "for indemnity and contribution by law and contract."

The insurance carrier for the Carnleys and C&C settled with Johnson for $100,000 before trial. Following a trial, the jury found against the three ATF defendants, Clarendon, and Wesley Carnley in the amount of $2,345,940.17.[4] It also found in favor of the ATF defendants on their cross-claim against C&C and the Carnleys in the amount of $539,566.25.

1. Appellants assert that the trial court erred by denying their motion for directed verdict on the issue of vicarious liability. We agree.

(a) Appellants first argue that they cannot be held vicariously liable because they are not statutory employers under the Federal Motor Carrier Safety Regulations ("FMCSR") as a matter of law. See 49 USC § 31101 et seq. and 49 CFR § 391.1 et seq. "Statutory employment is a theory of vicarious liability created by the FMCSR." *Omega Contracting v. Torres*, 191 SW3d 828, 848 (Tex. App. 2006).

The regulations pertinent to this issue follow:

Employee means any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle). . . .

49 CFR § 390.5.

Employer means any person engaged in a business affecting interstate commerce who owns or leases a commercial vehicle in connection with that business, or assigns employees to operate it. . . .

49 CFR § 390.5.

The parties agree that the statutory employer issue in this case centers around whether any ATF defendant leased the truck driven by Wesley Carnley at the time of the accident. As there was no written lease agreement between Carnley and any ATF defendant, we must determine whether an oral lease agreement can be implied from the record before us. See 1-7 Law of Commercial Trucking § 7.16 [5], n. 257 ("there is authority for the proposition that liability

---

[4] Compensatory damages totaled $1,742,845.70, attorney fees totaled $580,948.57, and expenses totaled $22,145.90. The defendants were given a $100,000 set-off for the previous settlement.

may attach to the carrier-lessee, even in the absence of a written trip lease").

Based on the record before us, we cannot find any evidence to support the conclusion that Wesley Carnley leased himself or his truck to an ATF defendant for the trip involved in the accident. All of the Carnleys, as well as ATF representatives, denied that ATF leased Wesley Carnley's truck or his services as a driver. ATF had no knowledge about C&C's use of Wesley Carnley to transport goods to C&C's warehouse for consolidation and certainly had no contact with Wesley Carnley about the trip resulting in the accident. As a result, we find that the appellants were entitled to a directed verdict in their favor on the issue of statutory employment. See *Caballero v. Archer*, 2007 U. S. Dist. LEXIS 12271 (W.D. Tex. 2007) (finding no evidence of any oral or written lease agreement).

In so holding, we note that an oral lease cannot be inferred from the fact that one of the ATF defendants held DOT authority to act as a motor carrier and *could* have entered into a lease. See *Caballero*, supra. Likewise, the fact that a third party listed "C&C/ATF" as the motor carrier on the bill of lading does not provide competent evidence of an oral lease. Cf. *Schramm v. Foster*, 341 FSupp.2d 536, 549 (Md. 2004) (identification of party as carrier on bill of lading prepared by third party without any involvement by carrier does not prove party was carrier for trip).

(b) Appellants also assert that they were entitled to a directed verdict on Johnson's claim that they are vicariously liable for C&C's negligent hiring of Wesley Carnley. We agree.

OCGA § 51-2-4 provides that "[a]n employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer."[5] In order to impose liability

> the employer must have retained at least some degree of control over the manner in which the work was done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, . . . or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, as to operative details. There must be

---

[5] Compare OCGA § 51-2-5 (delineating exceptions to the general rule, none of which apply here).

> such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

(Citations and punctuation omitted.) *Slater v. Canal Wood Corp.*, 178 Ga. App. 877, 880 (1) (345 SE2d 71) (1986).

The agreement between the ATF defendants and C&C provided that C&C was an independent contractor with "sole responsibility of the day-to-day operation of its business operations and full control and direction of [C&C]'s employees." While ATF may have required C&C to use "approved" motor carriers, retention of this general right, without more, did not alter C&C's status as an independent contractor.

ATF did not know that Colleen Carnley hired her stepson to transport a load of carpet to C&C's warehouse for consolidation on the day of the accident, and no evidence presented at trial demonstrated that any ATF defendant exercised control over the day-to-day operations of C&C. Based on this lack of evidence, the trial court erred by denying appellants' motion for directed verdict. See *McLaine v. McLeod*, 291 Ga. App. 335 (661 SE2d 695) (2008) (freight broker not liable for negligence of motor carrier and its employee driver because they were independent contractors).

(c) A theory of vicarious liability based upon a joint venture between C&C and the ATF defendants also fails to support the verdict against ATF. Vicarious liability for the conduct of another party to a joint venture cannot be established without demonstrating a right by each member of the joint venture to direct and control the conduct of the other. *Rossi v. Oxley*, 269 Ga. 82, 83 (1) (495 SE2d 39) (1998). In this case, the crucial element of mutual control is absent. Id.

(d) While we are constrained to find under existing law that ATF cannot be held vicariously liable for Johnson's injuries, we are troubled by the result in this case. As one commentator has noted, third party participation in the movement of interstate freight by freight brokers and logistics companies has increased while administrative oversight has diminished. James C. Hardman, Third Party Surface Transportation — Common Issues and Recent Trends: Third Party Contract Issues Concerning Motor Carriers, Brokers, and Shippers, 34 Transp. L. J. 307-308 (Fall 2007). In this case, the federal regulations simply do not provide a mechanism for Johnson, an injured member of the public, to recover adequate compensation for his injuries. See *Schramm*, supra, 341 FSupp.2d at 553 (noting that this is an area "in which the law may have to catch up" and encouraging regulators to act). We cannot, however, allow our sympathy for the plight of those injured by commercial trucks to lead us toward imposing strict liability on a party that does not possess

the requisite degree of control over another's conduct. Resolution of this public policy issue lies with the legislative branch of our government, not with the judiciary.

2. Because no evidence supports Johnson's underlying claim against appellants, appellants are entitled to judgment notwithstanding the verdict on Johnson's claim for attorney fees under OCGA § 13-6-11. See, e.g., *United Companies Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996) (award of damages on the underlying claim prerequisite to any award of attorney fees under OCGA § 13-6-11).

3. Appellants' remaining enumerations of error are rendered moot by our holdings in Divisions 1 and 2.

*Judgment reversed. Mikell and Adams, JJ., concur.*

## ON MOTION FOR RECONSIDERATION.

In a motion for reconsideration, Johnson asserts that this case "involves a motor carrier's use of a 'shell game' to exempt itself from accountability for financial responsibility and compliance with motor carrier safety regulations." The record, however, does not support this contention. Instead, it shows that ATF Trucking, LLC complied with Federal Motor Carrier Safety Regulations by leasing trucks owned by C&C, its independent contractor, when these trucks were used to transport goods under ATF's motor carrier license. The issue in this case is whether ATF can be held liable when its independent agent hired an unqualified driver, who drove his own truck, for a trip of which ATF had no knowledge or involvement, based upon a practice of which ATF had no knowledge. Given the evidence before us, a lease, whether defined as "a contract or arrangement," simply cannot be implied under the Federal Motor Carrier Safety Regulations. 49 CFR § 376.2.

We find no merit in Johnson's argument that we should apply the Restatement (Second) of Torts § 428 to his claim against ATF, because C&C was not "carrying on the activity" of ATF when it hired Wesley Carnley. See *Gudgel v. Southern Shippers*, 387 F2d 723, 726 (7th Cir. 1967) (finding § 428 did not apply when accident occurred after trip lease expired). C&C was an independent agent authorized to arrange for the movement of freight by ATF, as well as other motor carriers. In this case, the shipment of carpet bound for California was consolidated with other loads in C&C's warehouse and shipped to California by a motor carrier other than ATF. Therefore, neither C&C, nor Wesley Carnley, was "carrying on the activity" of ATF with regard to the trip resulting in Johnson's injuries. Restatement (Second) of Torts § 428. For the same reasons, C&C was not acting as ATF's agent with regard to this trip.

Based on the above, we deny Johnson's motion for reconsideration.

*Motion for reconsideration denied.*

DECIDED JULY 11, 2008 —
RECONSIDERATION DENIED JULY 31, 2008 —

*Hall, Booth, Smith & Slover, Denise W. Spitalnick, James H. Fisher II, W. Scott Henwood*, for appellants.

*Davis & Melton, F. Gregory Melton, Kenneth L. Shigley, Thomas L. Maddox*, for appellee.