**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 4, 2022**

# In the Court of Appeals of Georgia

A21A1269, A21A1270. GOLDEN PEANUT COMPANY, LLC et
     al. v. MILLER et al.; and vice versa.

REESE, Judge.

This case arises out of a collision between a tractor-trailer driven by Defendant

Lloy White and a passenger vehicle driven by Kristie Miller ("Miller"), which

resulted in the death of Miller and serious injuries to her son. Ross Miller,

individually and as Miller's estate administrator, and related parties ("Plaintiffs")

filed suit against various defendants, including White, Golden Peanut Company, LLC

(the owner of the trailer that White was transporting), and Archer Daniels Midland

Company ("ADM") (Golden Peanut's parent company).

We granted Golden Peanut's and ADM's application for interlocutory appeal

from the trial court's denial of their motions for reconsideration and for clarification

following the denial of their motions for summary judgment (Case No. A21A1269). Plaintiffs cross-appeal from the denial of their motion to exclude portions of the investigating officer's testimony (Case No. A21A1270). For the reasons set forth infra, we affirm in Case Number A21A1270 and reverse the denial of summary judgment in Case Number A21A1269.

Viewed in the light most favorable to the Plaintiffs, as the non-movants on the motions for summary judgment,[1] the record shows the following. At approximately 8:15 p.m. on September 27, 2017, after picking up a load of green peanuts from a farm to take to Golden Peanut's drying facility in Camilla, White made a left turn to head Northbound onto a two-lane road. Miller's vehicle, which was traveling Southbound, collided with the side of the trailer. Sergeant Chad Fallin of the Georgia State Patrol's Specialized Collision Reconstruction Team ("SCRT") did a walk-through of the crash site that night, and was the lead investigator of a SCRT team that performed a number of tests and issued a SCRT report.

The Plaintiffs filed suit against various defendants, asserting, inter alia, that White was negligent and that Golden Peanut and ADM were liable under theories of

---

[1] See *Palma v. Ga. Farm Bureau Ins. Co.*, 270 Ga. App. 333 (606 SE2d 341) (2004).

2

common-law vicarious liability and as a statutory employer under the Federal Motor Carrier Safety Regulations ("FMCSRs"). The trial court denied Golden Peanut's and ADM's motions for summary judgment and denied the Plaintiffs' motion to exclude portions of Fallin's testimony and SCRT report. These appeals followed.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

We review a trial court's evidentiary decisions for an abuse of discretion.[3] "With regard to the qualification of a witness as an expert, the question of whether a witness is qualified to give his opinion as an expert is one for the [trial] court. Its determination will not be disturbed except that it be manifestly abused."[4] With these guiding principles in mind, we turn now to the parties' claims of error.

---

[2] *Palma*, 270 Ga. App. at 333 (citations and punctuation omitted).

[3] *Clack v. Hasnat*, 354 Ga. App. 502, 503 (1) (841 SE2d 210) (2020).

[4] Id. at 504 (2) (citations and punctuation omitted).

1. Golden Peanut and ADM argue that the undisputed evidence demonstrated as a matter of law that neither of them had any right to control White's work. We agree.

"An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer."[5] "In the absence of evidence of actual control, the test distinguishing an employee from an independent contractor is whether the employer assumed the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract."[6] "The right to control the time means the employer has assumed the right to control the person's actual hours of work. The right to control the manner and method means the employer has assumed the right to

---

[5] OCGA § 51-2-4; see also OCGA § 51-2-5 (5) ("An employer is liable for the negligence of a contractor: [i]f the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference[.]").

[6] *Palma*, 270 Ga. App. at 335-336 (citation and punctuation omitted).

4

tell the person how to perform all details of the job, including the tools he should use and the procedures he should follow."[7]

(a) The evidence showed that Lloy White Trucking, White's sole proprietorship, owned the tractor involved in the collision. White paid for his own expenses in maintaining the tractor, including taxes and insurance. Through his sole proprietorship, White contracted with Larry Wood Trucking, which issued White an IRS form 1099 for tax purposes, and paid White a flat rate after taking a commission for its brokerage service.

During the harvest season, Golden Peanut engaged Larry Wood Trucking as a broker. Larry Wood Trucking had White contact Billy Benton at the Golden Peanut facility in Camilla. Benton gave White the contact information for farmers who had loads of peanuts ready for pickup. Each day, Benton "dispatched out" where the drivers needed to go and what they needed to do. White coordinated the pickups directly with the farmers, who gave him directions on where to pick up the peanuts.

According to White, Golden Peanut did not tell him the specific routes to take when driving the peanuts. After picking up the peanuts using the specialty trailer with tarp, White hauled the peanuts to Golden Peanut's facility in Camilla, where he

---

[7] Id. at 336 (citation and punctuation omitted).

worked with Golden Peanut employees to ensure the trailer was hooked up to a dryer. Golden Peanut did not provide any instruction to White on these tasks. While Golden Peanut occasionally requested that loads be picked up or delivered at specific times, it had no control over White's work schedule.

We conclude that these facts are not enough to create a genuine issue as to the vicarious liability of a manufacturer or distributor of goods.[8] "[T]o the extent that the delivery schedule may impose parameters involving the time within which the work must be executed, such is not sufficient to raise an issue as to the nature of the relationship between defendant [the distributor] and [an independent hauler]."[9]

Golden Peanut employees did give instructions to White on where to park to unload the peanuts when he got to the facility and to hook up to a dryer to ensure the peanuts would not rot, but "merely taking steps to see that the contractor carries out

---

[8] See *McLaine v. McLeod*, 291 Ga. App. 335, 340 (1) (661 SE2d 695) (2008) (affirming that a truck driver was an independent contractor as a matter of law where, although the distributor told the truck driver when and where to pick up and deliver the cargo, "the specific places and times were set by the [customers], not by [the distributor]"); *Perry v. Soil Remediation*, 221 Ga. App. 386, 387 (1) (471 SE2d 320) (1996) (affirming that a truck driver was an independent contractor where, among other things, the shipping company did not control the routes the truck driver took to or from shipment sites and the truck driver was free to work for other companies).

[9] *Tanner v. USA Today*, 179 Ga. App. 722, 723 (1) (347 SE2d 690) (1986).

his agreement, . . . is not such interference and assumption of control as will render the employer liable."[10] Further, although White was hauling a specialized trailer owned by Golden Peanut and he rolled or unrolled a tarp when picking up the peanuts, this did not convert him from an independent contractor to an employee.[11]

(b) Based on our conclusions in Division 1 (a), supra, and the lack of evidence in the record of any relationship between White and ADM (Golden Peanut's parent company), we need not address ADM's argument that the trial court erred by conflating it with Golden Peanut.

2. Golden Peanut and ADM argue that the trial court erred in denying summary judgment based on the statutory-employer doctrine under the FMCSRs.

(a) As an initial matter, Golden Peanut and ADM argue that the statutory-employment theory is no longer legally viable.

---

[10] *Slater v. Canal Wood Corp.*, 178 Ga. App. 877, 881 (1) (345 SE2d 71) (1986) (citation and punctuation omitted); accord *Helms v. Young*, 130 Ga. App. 344, 351-352 (3) (B) (203 SE2d 253) (1973) (physical precedent only).

[11] See *Palma*, 270 Ga. App. at 336 (regarding practicalities of onion harvest). Similarly, although White performed other work around the Camilla facility after the collision, for which he received some safety policies and procedures from Golden Peanut, a person "can be an independent contractor in one part of his activity and an employee in another." Id. (citation and punctuation omitted).

However, the record contains no indication that they raised this issue or made this argument before the trial court, and this Court cannot hear arguments raised for the first time on appeal.[12]

(b) Golden Peanut and ADM contend that, even if the statutory-employment theory remains viable, the trial court erred by holding they could be vicariously liable as the statutory employers of White under the FMCSRs.[13]

Under the statutory-employment theory, a lessee motor carrier is strictly liable under the FMCSRs for the operation of the equipment for the duration of the lease.[14] The FMCSRs define an "employee" as:

> any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a

---

[12] *AKA Mgmt. v. Branch Banking & Trust Co.*, 275 Ga. App. 615, 619 (2) (a) (621 SE2d 576) (2005) ("We are limited to considering only those grounds raised and ruled on below by the trial court and may not consider a basis for appeal not presented at the trial level.") (punctuation and footnote omitted).

[13] Plaintiffs concede that ADM is not a statutory employer, but argue that ADM is vicariously liable for Golden Peanut's statutory employer liability as a joint venturer or under an alter ego theory. Because we hold that Golden Peanut could not be White's statutory employer, we need not address this argument.

[14] *PN Express v. Zegel*, 304 Ga. App. 672, 675-676 (2) (a) (697 SE2d 226) (2010).

8

commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle)[.][15]

An "employer" is "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it[.]"[16] Thus, "the existence of a lease between the defendant and owner of the vehicle involved in an accident is the defining element in creating a statutory employment relationship under the FMCSRs."[17]

Here, the evidence showed as a matter of law that no lease existed regarding the tractor.[18] Plaintiffs do not argue that Golden Peanut owned or leased the tractor, but they contend that a lease is unnecessary to establish statutory employer liability because Golden Peanut owned the trailer. "Motor vehicle" is defined as "any vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and

---

[15] 49 CFR § 390.5T.

[16] Id.

[17] *Stubbs Oil Co. v. Price*, 357 Ga. App. 606, 611 (1) (848 SE2d 739) (2020).

[18] See *Stubbs Oil Co.*, 357 Ga. App. at 611-613 (1); see also *Clarendon Natl. Ins. Co. v. Johnson*, 293 Ga. App. 103, 108-109 (1) (a) (666 SE2d 567) (2008) (reversing denial of defendants' motion for a directed verdict where there was no evidence that the driver had leased himself or his truck to the defendants for the trip involved in the collision).

9

used upon the highways in the transportation of passengers or property, or any combination thereof[.]"[19] The FMCSRs specifically exempt "[a]ny type of trailer not drawn by a power unit leased from the same lessor."[20] Thus, because the Golden Peanut trailer was not drawn by a Golden Peanut tractor, the FMCSRs do not apply.[21]

3. Golden Peanut and ADM argue that, because they are not vicariously liable for White's conduct, the trial court should have granted summary judgment in their favor on the Plaintiffs' claims for punitive damages and attorney fees.

For the reasons set forth in Divisions 1 and 2, supra, Golden Peanut and ADM are not vicariously liable for White's conduct as a matter of law, and the FDCSRs do not apply. The trial court thus should have also granted summary judgment on the Plaintiffs' derivative claims against them for punitive damages, attorney fees, and litigation expenses.[22] Accordingly, we reverse the orders denying Golden Peanut's

---

[19] 49 CFR § 390.5T.

[20] 49 CFR § 376.21 (d).

[21] See id.; see also 49 CFR § 390.3 (a) (1) ("The rules [in the FMCSRs] are applicable to all employers, employees, and commercial motor vehicles that transport property or passengers in interstate commerce.").

[22] See *DaimlerChrysler Motors Co. v. Clemente*, 294 Ga. App. 38, 52 (5) (668 SE2d 737) (2008).

and ADM's motions for reconsideration and clarification of their motions for summary judgment.

*Case No. A21A1270*

4. Plaintiffs filed a cross-appeal, arguing that the trial court erred by refusing to apply the admissibility standard in OCGA § 24-7-702 ("Rule 702") and *Daubert*[23] to consider whether an investigating officer's expert testimony was reliable and helpful.

In their motion to exclude certain portions of Fallin's testimony and SCRT report, the Plaintiffs argued that Fallin's testimony that Miller was distracted by "something" and that Miller did not see the trailer "for unknown reasons" was unreliable because it ignored White's testimony and because Fallin failed to perform nighttime testing in reaching his conclusions. The Plaintiffs also sought to prohibit Fallin from testifying that White had the right of way at the time of the collision.

---

[23] See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993).

11

The trial court denied the Plaintiffs' motion, finding that Fallin was presumptively an expert as a police officer and rejecting the Plaintiffs' argument that a testifying police officer had to meet the additional evidentiary burdens of Rule 702 and *Daubert*. The court found that Fallin's testimony about the right of way was not a legal conclusion and that the attempt to strike this testimony lacked foundation. The court noted that at his deposition, Fallin stood by the conclusions in the SCRT report that Miller was distracted by "something," despite acknowledging that there was no evidence that she was distracted at the time of the wreck.

(a) The Plaintiffs argue that because Fallin's opinions are expert opinions, his testimony is subject to the admissibility standard in Rule 702.

"As to the expertise required of [an expert] witness, generally nothing more is required to qualify an expert than that he has been educated in a particular trade or profession; and this special knowledge may be derived from experience as well as study and mental application."[24] Specifically,

> [i]t has long been recognized that a police officer with investigative training and experience on automobile collisions is an expert, although of course the credibility and weight to be given his testimony is for the jury. Such an officer is an expert even if he is not trained to reconstruct

---

[24] *Clack*, 354 Ga. App. at 504 (2) (citation and punctuation omitted).

12

traffic accidents; and, as an expert, the investigating officer is allowed to testify about what he observed at the accident scene and to give his conclusions from those observations about what happened (as opposed to which party was at fault).[25]

Based on Fallin's extensive experience and training and the fact that he was the lead investigator in reconstructing the wreck in this case, the trial court did not manifestly abuse its discretion in finding that he was qualified to give his conclusions.[26]

(b) The Plaintiffs contend that Fallin's conclusion that Miller was distracted by "something" and that she did not see the trailer "for unknown reasons" was unreliable.

"[T]he trial court may not exclude an otherwise sufficient expert opinion simply because it believes that the opinion is not — in its view — particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury."[27] Accordingly, the trial court did not manifestly abuse its discretion as the

---

[25] Id. at 505 (2) (a) (citations and punctuation omitted).

[26] See id. at 506 (2) (a); see also id. at 504 (2) (citing OCGA § 24-7-702 (b)).

[27] *Emory Univ. v. Wilcox*, 355 Ga. App. 542, 543 (1) (844 SE2d 889) (2020) (citation and punctuation omitted).

13

Plaintiffs' arguments go to the weight, and not the admissibility, of Fallin's testimony.[28]

(c) The Plaintiffs argue further that the trial court erred by permitting Fallin to testify to an incorrect legal conclusion about which driver had the right of way. Specifically, they rely on OCGA § 40-6-73 to argue that Fallin's conclusion was incorrect as White should have yielded the right of way to Miller, who was approaching on the roadway that White was entering.[29]

> Where the investigating officer's opinion is based on his examination of physical evidence at the scene, and not solely on statements of witnesses, and where he does not opine as to the ultimate issue of a party's negligence, his opinion on the cause of the accident is admissible as an assessment of fact and not a legal conclusion or a conclusion constituting a mixture of law and fact. Thus, an investigating

---

[28] See id. at 544-545 (2).

[29] See OCGA § 40-6-73 ("The driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right of way to all vehicles approaching on the roadway to be entered or crossed."). But see *Jones v. Holland*, 333 Ga. App. 507, 508 (773 SE2d 797) (2015) ("While OCGA § 40-6-73 requires a driver entering a roadway to yield to approaching vehicles, the statute places no duty on the driver entering the roadway to yield to even properly approaching vehicles if they are not visible to the driver of the entering vehicle.") (citation and punctuation omitted).

14

officer may testify that one of the drivers was the sole cause of the accident; that the light was red; or that both drivers lost control.[30]

Based on the physical evidence and calculations he had performed, Fallin concluded that White had "already establish[ed] his lane of travel[ ]" by the time Miller's vehicle came into view. His conclusion that White had the right of way was therefore "admissible as an assessment of fact and not a legal conclusion[,]"[31] and the trial court did not manifestly abuse its discretion in denying the Plaintiffs' motion to exclude this testimony.

*Judgment affirmed in Case No. A21A1270. Judgment reversed in Case No. A21A1269. Doyle, P. J., and Brown, J., concur.*

---

[30] *Fortner v. Town of Register*, 289 Ga. App. 543, 546 (1) (657 SE2d 620) (2008) (punctuation and footnotes omitted).

[31] *Clack*, 354 Ga. App. at 506 (2) (a) (citations and punctuation omitted).